Ash v. Flowers Foods, and we'll begin with Stephen Durio for Ash. Yes, Your Honor. Thank you very much. I am Stephen, also known as Buzz Durio, representing the plaintiff and appellants Ash Bolton and Crawford and their co-distributors in seven similar actions described in our request for oral argument. Now, as you know from the prologue in our brief, we came here to make a highly textual argument, and we did make it in the brief. But I want to concentrate on something very different today. I want to concentrate on, quote, a common sense and reasonable reading of the law. And I think that that will much more quickly illustrate why the lower court should be reversed in this case. Everybody concedes that the MCA depends upon the activities of the employee in the case. Of course, you have to be a motor carrier, but nobody disputes that. So the activities in this case, they were dedicated local route distribution drivers. And you get a better sense of what they actually did if you look at their sworn declarations, which were in the record, and were part of our excerpts. And what they actually did was they got up and went to the warehouse sometime between midnight and well before dawn, and they drove a route from the warehouse, an average of 90 miles each route, an average overtime of 93 hours. One of these fellows worked over 100 hours. And they made 42 different stops on average on that route. Now, the lower court concedes, and so did Flowers, that these routes were not interstate routes. They were interstate routes. I mean, not interstate routes. They were intrastate routes. And you can see that on page three of the opinion. Can I just ask, is your legal argument going to be primarily the interstate commerce ended at the terminal warehouse, or is your legal argument going to be what happened at the warehouse was a reprocessing, or is it something different than those two? Both those are secondary arguments. Both those are secondary. So the primary argument is what? The primary argument is that if you look at the activities of these employees, they didn't, it's conceded, actually drive in interstate transportation on their routes. And if you look at their routes, it's virtually impossible that they could ever be likely to drive in interstate transportation. But doesn't our central freight decision, and then decisions that I'm sure you're ready to talk about, the unpublished Stiller decision, they say our focus is on the shipper's intent. Did they intend the product to go travel continuously interstate to their ultimate retail customer? That's what they say is the test. Do you think it's not, or you win under it? It's not. It's not. And the reason is 782.7B3, Romanettes 1 to 3, says their transportation, there can be no intent for transportation interstate beyond a distribution point. It says that flatly. So are case laws wrong? Most of the case law that you know, it's not wrong, but it's right for a different reason. And the problem is that in cases like Allen and Songer and Stiller, they put out this bromide, well, are they likely to be carrying goods in interstate commerce, or are they in the flow of interstate commerce? And that is pure, total dicta in your cases. I'm going to show you in a minute that Songer, Allen, and Amayu don't depend upon whether it's goods in the flow of interstate commerce. They specifically describe interstate trips, loads that were carried interstate, the driver's trips or the loader's trips that went interstate across state lines. They don't say anything about the goods that are being carried. Now, so the cases are right in the Fifth Circuit, the recent ones, under the MCA, but for the wrong reason. And the reason we got on this track, I'm glad you mentioned Central. This all comes from citing bromides out of cases that have nothing to do with the MCA. Central Freight has nothing to do with the MCA. Okay, but I just have to admit to being a little confused because your clients are the ones ordering this stuff. Why doesn't that make things a little different than when they're just being told what to do by their employer? Well, that goes to the issue of whether they're employees or not. We're fully prepared to discuss that issue if we ever get to trial. I don't think that's an issue here because it was assumed that we were employees, notwithstanding the ordering or whatever it was. So you're not going to answer my question? I'm sorry? You're not going to answer my question? No, I'll be glad to answer your question, Your Honor. Economic reality. The Fifth Circuit says the economic reality of the situation may be the way that they get orders or that they order things. Ours, our deliverment, 75 or more percent of the time were doing nothing but delivering products to national accounts that had already been sold. Yeah, Flowers says they were ordering, but what happened is Flowers gives them a computer and says, look at that computer. This is historical sales information. Now, you can adjust it up or down, but don't you change it. It's got to be these products for those accounts, and don't you, you know, if we send a bonus, you've got to add it. Whatever. The economic control in that situation is totally Flowers. And that goes off into the whole field of whether the employees are not, and ordering is only a small part of that. These guys are actually not ordering for the national accounts, which is 75 to 90 percent of the accounts that they deliver. They really boil down to deliverymen. If you look at their declarations, they say specifically what they do in the morning. They get a load that comes into a route. The route people at the, I'm sorry, the warehouse people have to separate it by routes, sometimes 30 or 40 routes at a warehouse. And then they get the part that's been allocated to their routes, and they have to reseparate it by quantity, by type, by destination for their stops on their routes. They even have to reload it in a totally different manner. They don't reprocess it. It is the same product that was ordered. The process, in my view, is the process described in 782.7, which is the process of sorting and allocating for distribution. Now, if that's not a process, it's in the regulations. If that's not a process, nothing is. And 782 — What are you going to do about the — I'm sorry? What are you going to do? Tell us about the exemption under the Motor Carriers Act. Thank you, Your Honor. Carly says after trial, if you haven't put the GCWR in, you lose. Okay. Reichowitz says on summary judgment, if you hadn't put the GVWR in, a slightly different measure, you lose summary judgment. In both those cases, there was no personal vehicle involved. The only issue was the weight of the employer's vehicles. And the employer in both cases had put positive proof in that their vehicles were over these limits, except with a few exceptions. And the plaintiffs didn't put in any proof of which vehicles they drove. They just said, well, there are some vehicles we drive occasionally that are a little lower. But they didn't — no specific instances, no proof. I think that Reichowitz is right because there was no inference of a vehicle lower than 10,001 pounds. But in this case, every one of our people drives a vehicle, and this is conceded by the lower court too, weekly. Every week, in fact, twice or three times a week, they drive a personal vehicle for something called pull-ups, which is when they have to go to the store and pull stock that they previously delivered out of the back and maintain the shelves and then pick up stales and those kinds of things. It's a shelf maintenance activity. And it's conceded in the record it happens at least twice a week, and they use their personal vehicles. There's no contradiction of that. So the inference that was raised in this case about personal vehicles, even though the declarations don't say the GVWR, we just didn't get to that in those declarations. We certainly are getting to it now, but the point is they all say I used a personal vehicle. And the best case to look at that as raising a reasonable inference is Butler v. Teefee X, I think is what it is. It's one of your district courts in the Southern District of Texas who says, you know, I'm not really comfortable with this Reichowitz case. Reichowitz was in the district court at that time. He's not talking about your case. Reichowitz is in the district court at that time. And Reichowitz really didn't talk about inferences, Rule 56. They just said there's no GVWR. But that's again an instance where they were right, but for the wrong reason.  The primary argument is we don't get to the MCA at all. Right. Exactly. And the reason we don't is because y'all . . . The rule that you're saying, unlike central freight and what you call bromides and dicta . . . Right. . . . is the case that most clearly says the rule that distinguishes between interstate and intrastate. Well, let me give you your cases. Just the best one. Just one. Not a lot. Well . . . Pick your best one. Songer is probably the best because it discusses regulations in detail. And what I have to say about Songer is very . . . And it's Allen and Amaya, the other two cases I want to . . . Because they followed him. Allen followed Songer and Amaya followed Allen. And in all of those cases, they talk about what the regulations say. In a regulation state, they cite 782.2, subsection D. Quote, the activities of drivers in connection with transportation which is not interstate in commerce, within the meaning of the Motor Carrier Act, provides no basis for exemption under 13B1. They cite 782.3, which states, the driver's work, quote, directly affects safety of operation within the meaning of Section 204 of the Motor Carrier Act whenever he drives a motor vehicle in interstate or foreign commerce within the meaning of the Act. The regulations go on to state, quote, he's not exempt if his job never involves transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act. So why did they lose in Songer? They lost because there was a likelihood that those drivers whose assignments were indiscriminate and many of whom had already traveled interstate, there was a likelihood for any one of them to travel interstate. That was the real reason Songer holds what it does. Songer itself says . . . All the product your clients are transporting originates out of Louisiana? Absolutely not. Ninety percent of the product that my clients deliver every day is bread that's made at a local factory that day. You're in Louisiana. Right. And they don't get it off of an interstate shipment, by the way. The interstate shipment comes with the specialty items to a bakery in Louisiana, in our case the Baton Rouge Bakery, and it's commingled with all the fresh-baked bread or the other specialty items that that local bakery makes. And once it's commingled, they don't send it to the driver for his route. They don't send it to the customer. They send it to the warehouse, and they pack it all together, all the routes, all the products, indiscriminate as to size, quantity, amount, destination, into a transporter, an 18-wheeler, that has to get unloaded and sorted every day and reallocated and reloaded in furtherance of local distribution, which are the exact words of 782.7B3, Romanette 1 through 6. On the LWPA claims, there's a problem of whether there was interruption or not. In other words, is that a threshold issue? Not an LWPA. The issue you were talking about earlier. No, no, I'm not talking about that just because your time is running out. Okay. The LWPA, in our view, the LWPA is very simple. There was existing controlling state law. Expressly waived? Pardon? Wasn't the LWPA expressly waived? No, Your Honor. I'm not aware of any evidence of that. The merits question is, are these deductions fine? But the threshold question I was just trying to ask about is, did you make the claim timely? And doesn't that depend on? It was timely because we were part of a class action which interrupted the prescriptive period, and it began to run again when we were decertified. The difficulty is, would that collective action truly have interrupted if it didn't contain this cause of action? Well, first of all. The deductions are not the same thing as the overtime. That's my concern. First of all, the case that's cited for non-interruption is not a class or collective action case, which is what ours was. It's not. A collective action case is totally different, and we've cited in the brief some cases which distinguish between that kind of case and the other. But on the LWPA claim, to help Justice Judge Wiener, the gravamen of that case is, at the time of this decision, there were three state court decisions, Newsom, LaPretre, Glavin, the third and fourth circuit of the state of Louisiana, that said, Look, it's not just fines. These deductions are illegal because they're shifting the employer's expense to the employee. And they're also forfeitures because they're collecting the training expense when they fire the guy. I think we have that. Thank you very much, and you've saved time for rebuttal. Thank you, Your Honor. Okay. We'll now hear from Amanda Rice on behalf of Flowers Foods. Good morning, Your Honors. May it please the court. The district court here correctly granted summary judgment on both the federal and state claims. I'll start with the federal claims because I think that was where the bulk of the argument was today. So in the federal claims, the court relied on the Motor Carrier Act exemption, which, as you know, says that overtime provisions don't apply to employees that fall under the Transportation Secretary's Motor Carrier Act jurisdiction. For decades, this court has correctly understood the Motor Carrier Act to cover the intrastate portions of an interstate journey, so long as there's continuous movement in interstate commerce. That continuous movement inquiry focuses on the shipper's intent, and here I think three facts are dispositive. All of them are undisputed. The first is that the pause at the warehouse in this case is extremely brief, between 6 and 12 hours. It's because Flowers products are perishable, and so they're trying to get them into customers' hands as soon as possible. The second is that the products were ordered and shipped specifically for particular out-of-state customers. And the third is that the products were not altered in any way during their pit stop. The packaging isn't even opened. So this case is indistinguishable from Ciller and Central Freight Lines and some other of this court's precedents, and it looks nothing like cases where— So what facts does it take to make it intrastate? Judge Haynes, I think there are two ways that the courts have sort of looked at this, and one is about the length of time that products stay in the warehouse. So if products are shipped into the warehouse and the warehouse just has, say, a standing inventory, the movement stops at the warehouse and months or even years later someone makes an order and the products are taken from the warehouse, that would be a break in the continuous transportation. The second issue that comes up in these cases is about modification and processing, and I think that's probably the more salient issue here, and that's where I understood my friend to be spending most of his time. Those are cases where the products themselves are altered. So a chemical is added to fertilizer. That happened to some of the products in Central Freight Lines. It's a new product. What came in was a particular product. They've changed it in the warehouse, and something else goes out. If they sent sugar from out of state but the warehouse made coffee, that would be intrastate? Correct, Your Honor. I think that would be a transformation in the product that would break the chain of commerce. Everybody says it's only 10 percent of specialty items that come from out of state. This is really a warehouse that's creating packaging that's mostly 90 percent intrastate. There's nothing in the record on that point, Your Honor. I'd direct you to pages 431 to 434 of the record where we describe the way that these products come in from out of state. Some of them are baked in Louisiana. Many of them are not. I'd say in cases like Songer, I think it was 2.75 percent of the transportation that was intrastate, and that was enough. I think it was 4 percent in Allen. So it's nothing like 90. A substantial portion of the products here are coming in from out of state. But even if it were 90, frankly, that would be still enough, the 10 percent. What is the application of the Louisiana Wage Payment Act? Sure, Your Honor. So I think the reason the district court rejected that claim was on the merits of the claim. I'm sorry? The district court rejected that claim on the merits. As Your Honor noted earlier, there's also a statute of limitations problem with those claims. The argument that was waived was that the court should not have continued exercising supplemental jurisdiction over those claims. Or I think that's what you're referring to, Your Honor. And the plaintiffs never argued that below. They never said to the court, hey, if you resolve these federal claims and all that's left are the state claims, you should remand the state law claims back to the court. Does the Motor Carriers Act exempt this? The Motor Carrier Act only relates to the federal claims, Your Honor. So the Louisiana state law claims don't implicate the Motor Carrier Act. On those claims, the question is about whether the deductions at issue, which were for things like warehouse rent, sort of inventory that isn't sold, products that go stale, things like that, are deductions or whether they're fines within the Louisiana Wage Payment Act. The district court correctly found that they weren't. The word fines has a very specific meaning under Louisiana law. If we have to resolve the tolling question first, we can jump right to Sampson and whether these are fines. Correct. It's not a jurisdictional issue. But I also think the statute of limitations argument is pretty straightforward. Is Sampson controlling law on us as to interpreting 635? I think it is, Your Honor. I would say Sampson itself relied on Louisiana court opinions, including Brown in particular. So it's this court's interpretation of Louisiana state courts. But I think the Louisiana courts and this court are in accord on this issue. And I think Brown's the clearest case. The penalties at issue in Brown, for example, just because I think it's helpful to sort of think about. Every time you deliver the product late, we're going to deduct $100. I think that might well be a fine or a penalty under Louisiana law. It has sort of two elements that I think the court found important in Sampson. One is it's a rule violation, you know, don't deliver anything late. The second is that the amount is arbitrarily fixed. As you said, you deduct $100. I think it might be a closer case or look a little more like Sampson is if, you know, we're going to deduct the money you would have gotten for those products or it was tied to the products or the loss in some specific way. I think then it wouldn't be a penalty. Can I turn the clock back to his three strongest cases, Songer, Allen, and Maya? Yeah, absolutely. You're comfortable with those decisions in the logic? They just don't apply here? I'm very comfortable with those decisions, Your Honor. I think they're all consistent. In Songer, the drivers were found to have been in interstate commerce. The issue in Songer, I think, was that some drivers didn't drive interstate routes and some drivers did, and so the question was, you know, could you look at this? Similar to Allen, actually, on a class-wide level, were you looking at the specific employees? There was no products moving in interstate commerce in that case. I think these were employees working on wells, so it wasn't about the transportation of products at all. So I think the cases that are more on point are the products cases, Siller, of course, but also Central Freight Lines. So the shoe case that was dairy products from 1966, I think that's actually the case that has the closest timeline to this one. The products there, I think, moved the same day or next through the warehouse because they were perishable, like the products here. In Central Freight Lines, the fertilizer was stored for longer, I think up to a month, and the tanks held fertilizer based on 20 to 25 customers' worth. What about the Butler case from Texas? Judge, we know the Butler case from Texas is about the Technical Corrections Act issue, which I'd be happy to speak about. I think the Butler case involves the question there is about the weights and the weights of these vehicles and whether the plaintiffs have put forward evidence on that point. This court held in Carley and then again in Rykorsiewicz that it's plaintiffs' burden to put forward that evidence. And in Butler, what they put forward was a declaration involving the make and model of vehicles and that those vehicles weighed less than 10,000 pounds. I'm not sure whether that's enough under this court's decisions in Carley or Rykorsiewicz, but you don't have to get that far because there's nothing at all in the record here. So I think even assuming that's right under Butler, I'm not sure it is. In Rykorsiewicz, the court seemed to suggest that make, model, and even in data about what those vehicles weighed, it wasn't enough without the year and the VIN number. So I think that's probably the better analysis in what's required here. But even under Butler, I don't think they've done enough. The other issue I understood my friend to be alluding to here, I don't know that he said it directly, was about whether these court's decisions remain good law in light of the Supreme Court's statement in Encino Motorcars. Maybe that's an argument that was in the briefs for looking past this court's precedents. You need to get past this court's precedents to rule in the distributor's favor here because they're so on point. But just briefly on Encino Motorcars, what the Supreme Court said in that case is that courts have to give these exemptions a fair reading. I think that's exactly what this court has consistently done. Between a place in one state and a place in another state is naturally read to sweep in the component parts of that journey. This court's just looking at when that journey begins and ends. And reading Encino Motorcars to undermine this court's precedents would be particularly strange. The court was criticizing the Ninth Circuit there for reading an exemption too narrowly. So I don't think you can take that case and use it to further narrow an exemption here. If the court has any other questions, I'd be happy to answer them. Thank you very much. Thank you. We'll hear the rebuttal. Thank you, Your Honor. Central Freight Lines, I will say again, is not an MCA case. Central Freight Lines . . . and if you take the genealogy of the cases to find out where this Commerce Clause language comes from, it comes from the state of Texas, which is a tariff case. It had nothing . . . it was an Interstate Commerce Commission tariff case. It has nothing to do with the MCA. And the genealogy of that bromide about goods in interstate commerce is not an MCA. The genealogy of all those cases is bad because they come out of Commerce Clause. Now, Commerce Clause . . . look at 782. It says over and over and over again, it's not the same thing. The meaning under the MCA and for the FLSA is not the same thing. The FLSA was to exhaust Congress jurisdiction by going as far as they could under the Commerce Clause. The MCA exemption is just the opposite. It's to protect a narrow class of workers who couldn't engage in overtime because it would be unsafe. And the exemption is even narrower. You have to find out that . . . you have to prove that the driver affects the safety of operation. I think I know what you meant about waived. The argument is that we waived the LWPA jurisdiction defense because we submitted to a summary judgment. Your Honor, we thought we were right on the summary judgment. The issue of whether or not the court had jurisdiction was not an issue we had to argue or brief. There's no waiver there at all. Your cases, Enochs v. Lompasa, and there's a whole slew of them since then, cite Enochs. They say that has nothing to do with it. The court has to note its own jurisdiction. And when it loses jurisdiction, it can't go any further. It's got to dismiss without prejudice so the claims can be refiled in state court. Now, again, look at Songer, Amaya, and Allen. They all say this is a bromide we just picked up. Justice Dennis, in his dissent from Allen, says we only have implied jurisdiction there. We've been saying we have jurisdiction there, but it's really not. If you look at Songer, Allen, or Amaya, they all talk about actual interstate travel as defined by the MCA. They say, well, no, these guys didn't have anything to do with those loads that went across the state line, these loaders. Oh, those drivers weren't driving across the state line. You can look at those cases, and that's why the bromide about commerce is dicta. Your rule of law really is unless they cross the state line . . . For MCA purposes, exactly, and that conforms to exactly what the DOT does. Let's say our court has had a little dissonance. Is there any circuit that has said that's the rule?  Is there any federal circuit that has said unless you actually drive across state lines, you are not entitled to the MCA exemption? Can you think of a court that said that? I didn't research that. That would be pretty important if you're saying we're wrong, the regs are clear. One might think that there'd be some circuit somewhere that would have said that. I'm not saying you're wrong. I'm saying if you look at the MCA cases, most of them make . . . And only under the Secretary of Transportation's protection if you cross state lines, that's what you're saying. And our law has . . . And that's all the MCA says. Okay. And that's all the regulations say. That means we've made a pretty big mistake in a lot of cases. I do not think so. Okay. I think what happened in those cases . . . Look, it's confusing, and a lot of this gets confused, and that's why the genealogy is so important. You've got to look at what's an MCA case. You can't cite something that's a tariff case or interstate commerce clause FLSA case that's not an MCA case. It's just like apples and oranges. And again, my question, if it were that bright line of rule, one would think looking across the country, a circuit court would have said, hey, the MCA exemption is much less than you all think. You don't have to look across the country. You can look to your own district courts in Butler, and there are a number of them. And as a whole, I was prepared to talk about cases on local delivery drivers, Your Honor, and I think that will speak to the point. When a local delivery driver is involved, the Fifth Circuit has almost universally said that's not an interstate commerce. The difference is it's a dedicated route driver. If you have random assignments and you've got all these drivers that could be an interstate commerce, like Songer, Amaya, that's still an interstate commerce. But they're using the right rule from the MCA. They're not using this bromide of goods and commerce. The MCA is about transportation. It's not about goods. And thank you, Your Honors. I'm sorry. No problem. We really appreciate both sides' arguments. This case is now under submission, and this concludes our argument.